# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**EMANUEL A. TUGGERSON,**
**D.O.C. # S60786,**

     **Plaintiff,**

**vs.**                                                   **Case No. 4:22cv66-MW-MAF**

**OFFICER T. SKETO, et al.,**

     **Defendants.**
_____/

## REPORT AND RECOMMENDATION

This is a prisoner civil rights case alleging the unnecessary and excessive use of force and then the denial of medical care. Plaintiff is a prisoner in the custody of the Florida Department of Corrections, and is proceeding pro se.

In June of 2023, Plaintiff filed a third amended civil rights complaint, ECF No. 55, which is the operative pleading. The parties engaged in discovery, ECF Nos. 37, 77, and 81, and thereafter, the Court prepared to rule on two pending motions for summary judgment, ECF Nos. 62 and 85. In the course of that review, it was discovered that the summary judgment

motions filed both by Plaintiff and Defendants addressed the wrong version of Plaintiff's complaint.  *See* ECF No. 90.  Thus, those motions were denied as moot and the parties were provided additional time in which to file amended motions for summary judgment.  ECF No. 90.

Now pending is Defendants' amended motion for summary judgment, ECF No. 95, supported by numerous exhibits, ECF No. 94, including video evidence, ECF No. 93, which has been sealed.  ECF Nos. 91-92.  Plaintiff has filed a response, ECF No. 103, to Defendants' motion, and Defendants have filed a reply, ECF No. 104.  The motion is ready for a ruling.

**Brief Summary of Plaintiff's Complaint, ECF No. 55**

Plaintiff alleged that on September 29, 2021, Defendants Sketo and Moore used force against Plaintiff, without cause or justification, by spraying him with chemical agents.  ECF No. 55 at 7.  Plaintiff said he was "not causing a disturbance," but was "suffering from a mental breakdown." *Id.*  After he was sprayed, a cell extraction team entered Plaintiff's cell and used excessive and unnecessary force against him.  *Id.* at 8-9.  During that incident, while Plaintiff was holding onto the cell door handle, Defendant Moore stepped in and used a set of handcuffs "like brass knuckles," punching Plaintiff in the hand several times to force him to let go of the

handle. *Id.* at 8. Plaintiff alleged that after he submitted to hand restraints, additional force continued to be used, and one officer allegedly used his finger to penetrate Plaintiff's buttocks through his boxer shorts. *Id.* at 9. He said other officers failed to intervene in the assault, and the officer recording the cell extraction intentionally moved into a position to have a "limited observation" by the camera. *Id.* Further, Defendant Sketo used unnecessary force after the cell extraction was completed, and while Plaintiff was being shackled, by dropping his knee on Plaintiff's face and jaw. *Id.*

**Procedural Issue**

After Plaintiff filed his second amended complaint, ECF No. 24, Defendant Hewett (whose surname is incorrectly spelled by Plaintiff as Heuett) filed a motion to dismiss. ECF No. 34. In response, Plaintiff filed a document entitled "memorandum acceptance of dismissing 'Warden G. Hewett' from complaint." ECF No. 38. Plaintiff expressed his willingness to dismiss that Defendant from this action, but advised that he was not denying "any of the allegations" he raised against him. *Id.* at 1. Plaintiff further said that he wanted to proceed with this case against the remaining Defendants. *Id.* Accordingly, an Order was entered on March 14, 2023,

accepting Plaintiff's "memorandum" as a notice of voluntary dismissal

pursuant to Rule 41 and denying Defendant Hewett's motion to dismiss,

ECF No. 34, as moot in light of Plaintiff's voluntary dismissal.  ECF No. 39.

The early version of Plaintiff's complaints included "John Doe"

Defendants.  However, Plaintiff used discovery to identify those persons,

and then filed a motion to have those Defendants served with process.

ECF No. 56.  Plaintiff identified the five newly added Defendants (Morgan,

Sims, Smith, Thompson, and Fitch), and his motion for service was granted

on June 20, 2023.  ECF No. 59.  That Order made clear, however, that

Plaintiff's inclusion of Defendant Hewett in the third amended complaint did

"not reinstate Defendant Hewett" in this case.  *Id.* at 3-4.  This case

proceeds against these eight Defendants only: Sketo, Moore, Gushlaw,

Morgan, Sims, Smith, Thompson, and Fitch.

**Standard of Review**

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus,

summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  As noted above, the parties have been provided sufficient time for discovery.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[1] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case."  Id. at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

---

[1] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Sconiers v. Lockhart, 946 F.3d 1256, 1262-63 (11th Cir. 2020), and the Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  Sconiers, 946 F.3d at 1263 (11th Cir. 2020) (citing Tolan v. Cotton, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (quoted in Sears v. Roberts, 922 F.3d 1199, 1205 (11th Cir. 2019)).

As noted above, Defendants provided video evidence in support of their summary judgment motion.  ECF No. 94-3 (filed under seal).  Where a "video obviously contradicts Plaintiff's version of the facts," the Court must "accept the video's depiction instead of Plaintiff's account."  Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing to Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also* Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018).  However, because Plaintiff is the nonmoving

party, his version of events must be credited "where no obviously contradictory video evidence is available."  Pourmoghani-Esfahani, 625 F.3d at 1315.

**Rule 56 Evidence**

On September 29, 2021, Plaintiff was housed in confinement in the G-dormitory at North West Florida Reception Center [NWFRC].  ECF No. 55 at 7;[2] ECF No. 94-1 at 11.  Plaintiff acknowledges that at the time of the incident at issue in this case, he was "suffering from a mental breakdown." *Id.*  Plaintiff testified in his deposition that the day before the incident, he received news that his cousin had passed away from COVID-19.  ECF No. 94-1 at 10-11.  Plaintiff said he "was in [a] real emotional place" as he had recently lost his criminal appeal and was having family problems as well. *Id.* at 10-12.  He indicated he has a history of mental illness and was "dealing with stress and frustration" during the relevant period of time.  *Id.* at 9, 12.  For approximately a week before the incident, Plaintiff said he

---

[2] Plaintiff's complaint, ECF No. 55, was signed under penalty of perjury and, thus, facts alleged within that pleading constitute evidence which may be considered in ruling on the summary judgment motion.  Sears v. Roberts, 922 F.3d 1199, 1206 (11th Cir. 2019); Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014) (cited in Sanchez v. Sanchez, No. 5:10cv288-RH/EMT, 2015 WL 5016842, at *1 (N.D. Fla. Aug. 24, 2015).

had "serious mental health issues" and "was in a bad state of mind."  ECF

No. 94-1 at 13.  He described his "state of mind" as not being "aware

consciously" of what he "was going through" and having "moments" that he

could not "recollect."  *Id.*

He acknowledged that force was used against him on a prior date,

September 24, 2021, which is five days prior to the incident at issue in this

case.  ECF No. 94-1 at 13.  On September 24th, Plaintiff "was creating a

disturbance" which resulted in a forced cell extraction.  ECF No. 94-2 at 5.

Plaintiff attempted to use his mattress as a barrier to prevent his extraction,

but eventually officers restrained him after using chemical agents,[3] and

then placed him in a "restraint chair" to securely place him in a

decontaminated cell.  On September 28th, a recommendation was made to

move Plaintiff into CM 1 [close management I] so he could "be better

managed."  *Id.*  Furthermore, Plaintiff was referred for a mental health

evaluation on that same date, and a recommendation was provided by a

---

[3] Portions of this exhibits have been redacted, making it difficult to read.  ECF No.
94-2 at 5.  However, it is apparent that chemical agents were used against Plaintiff
because he had to be placed in a decontaminated cell.  *Id.*  It is also apparent that
Plaintiff assaulted staff.  *Id.* at 5-6.  Furthermore, prior to the use of chemical agents,
medical staff provided a "risk assessment" which stated that there were no known risk
factors were identified which would preclude the use of chemical agents or an electronic
immobilization device, or exacerbate Plaintiff's current health status.  ECF No. 94-2 at 9.

mental health clinician. ECF No. 94-2 at 7.[4] Plaintiff was given notice of the CM-I recommendation at 7:15 on September 29th. *Id.* at 5-6.

Plaintiff testified in his deposition that on September 29th, he was not yelling in the dormitory and said he was not "making any loud noises." ECF No. 94-1 at 15. He acknowledged in his complaint that he was "mentally unable to be responsive," but said he was "not causing a disturbance to justify a 'use of force.'" ECF No. 55 at 7.

Despite alleging that he was "not causing a disciplinary disturbance," *see* ECF No. 55 at 7, Plaintiff acknowledged that his "cell door and window had been covered with 'feces' and a visual observation" into Plaintiff's cell "could not be completed." *Id.* at 11. Plaintiff admitted in his complaint that he was "covered in" feces as well. *Id.* He testified in his deposition that he remembered "having feces on" him "and just everywhere." ECF No. 94-1 at 16. Further, Defendants' video evidence confirms that Plaintiff's cell window was covered in smeared feces which prevented officers from seeing inside his cell. ECF No. 93-3(4), *see also* ECF No. 94-3 at 7.

---

[4] It is unclear from that record whether Plaintiff was evaluated by one or two clinicians. The record includes a stamp for R. Cox, M.S. LMHC, and Bruce Borkosky, a psychologist. ECF No. 94-2 at 7. Much of that record has been redacted, but another exhibit advises that Plaintiff was given a "crisis intervention" by Ms. Cox. ECF No. 94-3 at 17.

Plaintiff refused multiple verbal orders from Defendant Sketo to submit to hand restraints so he could be removed from his cell.  *Id.* Although prison officials sprayed chemical agents into Plaintiff's cell three separate times, Plaintiff continued to refuse to comply with orders to submit to restraints, and he again used his "mattress to circumvent the effects of the chemical agents."  *Id.*  A "forced cell extraction" was authorized to remove Plaintiff from the cell.  *Id.*  Participants in the use of force were Defendants Gushlaw, Moore, Morgan, Sims, Sketo, Smith, and Thompson. ECF No. 94-3 at 10.  Defendant Fitch held the video camera during the use of force and post use of force events.  *Id.* at 43.

The undisputed evidence reveals that Defendant Moore[5] administered three, one-second bursts of OC chemical agents into Plaintiff's cell through the partially-opened, but chained cell door at 12:45 p.m. on September 29th.  ECF No. 94-3 at 15; ECF No. 93.  Plaintiff continued to refuse to submit to hand restraints.  ECF No. 94-3 at 15.  At 12:53 p.m., Defendant Moore administered three more one-second bursts of OC chemical agents into Plaintiff's cell.  ECF No. 94-3 at 15.  Again,

---

[5] Although the evidence shows Defendant Moore administered the chemical agents, Defendant Sketo, the shift supervisor, is the official who was issued the chemical agents, and returned them.  ECF No. 94-3 at 65.

Plaintiff continued to refuse to comply with verbal orders and used his mattress to cover himself and circumvent the effects of the chemical agents. *Id.* At 1:01 p.m., Defendant Moore administered three final one-second bursts of chemical agents, this time CS chemical agents, into Plaintiff's cell. ECF No. 94-3 at 15. Plaintiff continued to refuse to submit to hand restraints. *Id.*

At 1:41 p.m., physical force was used to remove Plaintiff from the cell. *Id.* The cell extraction team arrived at Plaintiff's cell and Plaintiff admits that while the door was "being rolled back," he grabbed the handle of the door. ECF No. 94-1 at 19-20. The team attempting to pin Plaintiff to the cell floor using a shield, but Plaintiff continued to resist by trying to hold the door and flailing his body on the floor. ECF No. 94-3 at 15. Defendant Moore had to use "reactionary physical force to overcome" Plaintiff's "physical resistance to lawful commands" as he was "attempting to hold the cell door partially closed to prevent the cell extraction team's entry." ECF No. 94-3 at 31; *see also* ECF No. 94-3 at 15.

Plaintiff admits that he only let go because the officer (Defendant Moore) struck his hands several times. ECF No. 94-1 at 21. He also admits that the officers ordered him to get on the ground and he willingly

complied.  *Id.* at 22-23.  He said he "got down" on his stomach and put his hands behind his back.  *Id.* at 23.  While on the ground, Plaintiff was handcuffed, but claimed that one of the officers "struck" him several times on the side of the face and back of the head.  *Id.* at 24.  Plaintiff admits that he was trying to "wiggle" under the bunk and the officer "stuck his hand under the bunk and started gouging [him] to [his] eyes . . . trying to like gouge [his] eyes out."  *Id.* at 24.

Plaintiff also testified in his deposition that one of the "officers stuck his finger through [his] boxers into [his] butt."  ECF No. 94-1 at 42.  Plaintiff said he thought the officer penetrated his anus with his thumb.  *Id.* at 44.  Plaintiff does not know which officer did so, but he believes the officer was wearing a glove.[6]  *Id.* at 45.  Plaintiff also believes "there was no way that the other officers in the cell extraction" were not aware that Plaintiff was "sexually assaulted."  *Id.* at 48.

Plaintiff was brought to his feet and removed from the cell.  ECF No. 94-1 at 30-31.  Plaintiff was given a cold water shower.  *Id.* at 29-30.

After Plaintiff was provided an opportunity to shower, the officers began escorting Plaintiff to medical, ECF No. 94-3 at 15, but during the

---

[6] All officers involved were wearing gloves and protective clothing.  ECF No. 93-3(5).

escort, Plaintiff fell.  *Id.*  It is unclear whether he fell of his own accord, or

whether it was due to the fact that his boxer shorts were tangled around his

leg irons.[7]  *Id.; see also* ECF No. 93-3(5).  Defendant Sketo was of the

opinion that Plaintiff "fell on his own accord."  ECF No. 94-3 at 31.

Nevertheless, because Plaintiff then "refused to walk on his own

accord," he was placed in the "escort chair" and taken to medical for

evaluation.  ECF No. 94-3 at 15, 26.  Plaintiff was evaluated by Nurse

Lindsey at 1:55 p.m.  *Id.* at 46.  The evaluation took place in the medical

room of the confinement building while Plaintiff was sitting in the restraint

chair.  *Id.*  No injuries were noted, but "fecal matter" was observed on

Plaintiff's right leg.  *Id.*  Plaintiff "refused to answer any questions asked by

medical staff."  *Id.*  The medical report indicated Plaintiff was in "no

distress" and no treatment was indicated.  *Id.* at 46-47.

The escorting officers then took Plaintiff from that room to a new,

decontaminated cell, but the cell door release malfunctioned and officers

---

[7] Having reviewed the video, the statement made in "Incident Report" is not accurate. ECF No. 94-3 at 15.  The report indicated Plaintiff's boxer shorts had been cut off and may have become "tangled around his leg irons" which caused him to trip.  *Id.* However, the video makes clear that Plaintiff came out of the shower wearing boxer shorts and officers attempted to wrap a sheet around Plaintiff's mis-section since he was not wearing other clothing.  ECF No. 93-3(5).

were required to await assistance.  ECF No. 94-3 at 15, 31.  While waiting,

Plaintiff "lowered his head and charged toward staff."  *Id.*  Plaintiff struck

Defendant Gushlaw in the groin area.  *Id.* at 15.  Defendants Moore and

Morgan were able to use their body weight to put Plaintiff in a "prone

position"[8] to prevent Plaintiff from getting back up and further assaulting

staff.  *Id.* at 15, 32, and 41.  After he was restrained again, Plaintiff was

returned to a standing position, ushered into the cell, and then placed face

down in the cell with the shield over his body to prevent any further

resistance while his leg irons were removed.  ECF No. 94-3 at 17.  Plaintiff

was left in restraints because he declared a psychological emergency.  *Id.*

Plaintiff testified that while the cell extraction team was "pinning" him

to the ground, Defendant Sketo came up "and just dropped a knee" on his

face."  ECF No. 94-1 at 40.  Plaintiff said it "was just like a brief strike" and

then he "got back up and walked away."  *Id.*  Plaintiff said it was "a cheap

shot."  *Id.* at 42.

After that spontaneous use of force, Plaintiff received a second

medical examination at 2:09 p.m., this time at the front of his cell.  *Id.*

Again, no injuries were noted and Plaintiff did not appear to be in any

---

[8] That type of force is referred to as "reactionary force."  ECF No. 94-3 at 27, 32.

distress.  *Id.* at 17, 48-49.  On the other hand, Defendants Gushlaw and

Smith reported injuries from Plaintiff's charging at them.  ECF No. 94-3 at

15, 20, 54-55, and 58-59.  Plaintiff was monitored for 45-60 minutes for

signs of respiratory distress from use of the chemical agents by Defendant

Fitch.  ECF No. 94-3 at 28.

Plaintiff did not report injuries, or being assaulted, for approximately

five hours after the incident.  A medical report indicates Plaintiff reported an

injury to his hand at 7:45 p.m. on September 29, 2021, and he was

examined at 8:00 p.m.  ECF No. 103 at 30.  The injury was described as

superficial abrasions on the left hand and wrist near cuffs.  *Id.*  The nail on

the index finder was split, with "minimal bleeding," and Plaintiff had a

superficial abrasion on his right knee.  *Id.*  Contrary to that medical report of

superficial abrasions, Plaintiff testified in his deposition that his "hands

were busted open and disfigured from the strikes" to his hand from

Defendant Moore.  ECF No. 94-1 at 52-53.

At some point on September 29, 2021, Plaintiff submitted a grievance

to the warden which alleged that at approximately 1:45 p.m., while

Defendant Sketo had Plaintiff pinned to the floor, another officer of the cell

extraction team "penetrated [his] anus with what [Plaintiff] believed was a

gloved finger." ECF No. 93, Ex. A at 15. Plaintiff admitted that "some force was necessary" but said that the penetration "was extreme." *Id.* Upon receipt of that grievance, the Office of the Inspector General conducted an investigation in October 2021. *Id.* at 17. The investigation concluded by finding Plaintiff's claim was "unsubstantiated" due to insufficient evidence. *Id.* at 1, 4. Notably, Plaintiff "refused to provide" a witness statement about the incident during the investigation, and then denied making "any allegations against staff for sexual abuse." *Id.* at 4, 5, 8-12.

Defendants' video evidence of the incident has been reviewed. ECF No. 93-3(4) - (5). At 12:30 p.m. on September 29, 2021, Defendant Sketo makes an introductory statement that Plaintiff was yelling into the quad and refusing to submit to hand restraints. ECF No. 93-3(4). The video then shows Defendant Sketo approaching Plaintiff's cell at approximately 12:40 p.m. to provide a final warning for Plaintiff to remove the barricade from his window and submit to hand restraints or chemical agents will be applied. *Id.* No response from Plaintiff can be heard, nor is it possible to see into Plaintiff's cell because it is covered in feces, although Plaintiff appears several times at the window of the cell. *Id.* At 12:45 p.m., approximately six minutes into the video, Defendant Sketo opens the door a few inches

and chemical agents are dispensed into Plaintiff's cell. *Id.* A second application of chemical agents into Plaintiff's cell occurred at approximately 12:53 p.m., just shy of the 14-minute mark of the video. *Id.* The third application of chemical agents occurred at approximately 1:01 p.m., which is around the 22-minute mark of the video *Id.* Notably, in between each use of chemical agents, Plaintiff was approached by Defendant Sketo and asked to submit to hand restraints, but he refused to cooperate. *Id.* Defendant Sketo states that Plaintiff was using his mattress to protect himself from the effects of the chemical agents. *Id.*

Thirty-two minutes into the video, Plaintiff was still refusing to cooperate; Defendant Sketo announced that the cell extraction team was being gathered. ECF No. 93-3 (4). Five minutes later, Defendant Sketo checked again and Plaintiff was still non-compliant.[9] At the 43-minute mark, Defendant Sketo approaches the cell again to ask if Plaintiff will submit to hand restraints. *Id.* During the 46th minute of the video, Plaintiff can be seen and heard banging loudly on his cell door. *Id.* After 56 minutes, Plaintiff is approached one final time and asked to submit to hand

---

[9] Plaintiff's non-compliance can be verified because Plaintiff does not approach the cell window to submit to hand restraints.

restraints, but he again refuses. *Id.* At the 59 minute of the video, the cell

extraction team has assembled to remove Plaintiff from his contaminated

cell. *Id.*

Part 2 of the video begins with each team member explaining his

position and role in the extraction. ECF No. 93-3(5). The six officers

accompany Defendant Sketo to the cell door as Defendant Fitch holds the

video camera.[10] *Id.* Just as the door to the cell is beginning to open for the

cell extraction (between 2-3 minutes of the second video), the camera

angle drifts upwards. ECF No. 93-3(5). The video is not helpful to show

the team's entrance into the cell, Plaintiff's efforts to prevent the door from

being opened, or the blows to Plaintiff's hand in an effort to make Plaintiff

release his grip. *Id.*

Several additional verbal orders can be heard directing Plaintiff to

stop resisting inside the cell so restraints can be applied by the extraction

team. *Id.* When Plaintiff emerges from the cell, he is handcuffed and in leg

irons, wearing only white boxer shorts, and is covered in feces. *Id.* He is

taken to a shower cell, left in hand restraints, and directed to put his head

---

[10] In the future, the D.O.C. may want to consider use of a tripod to hold the camera
still and accurately film the incident.

under the cold water to "decontaminate." *Id.* Plaintiff begins showering at approximately the 6-minute mark of the video. *Id.* Because he continued being "disorderly" and was yelling obscenities in the shower, the water was turned off at the 9:39 mark of the video, which was 1:49 p.m. *Id.*

Just after the 15-minute mark, the team arrives to remove Plaintiff from the shower cell. *Id.* Plaintiff is yelling that he does not want anything on him, that he has clothes on, while officers attempt to cover his lower body with a sheet. As Plaintiff goes through a doorway, he goes to the ground. The camera does not clearly show whether he tripped, went to the ground on his own, or something else. *Id.* Plaintiff said he was not walking because he was "meditating" and was "in another dimension" right now; officers placed him in a restraint chair. *Id.* At the 17 minute mark, Plaintiff continued yelling for the officers to take him to their females, to their whores, and said he wanted "concubines" like King David. *Id.* Defendant Sketo states on the video at 1:57 p.m. that prior to Plaintiff being placed in the escort chair (restraint chair), he "dropped his body weight on his own," and that was why he was placed in the chair. ECF No. 93-3(5). Another report, the "Escort Chair Inmate Observation Log" clarifies that Plaintiff was placed into the chair for "refusing to walk." ECF No. 94-3 at 26.

Case No. 4:22cv66-MW-MAF

Plaintiff was given an examination by medical while he sat in the restraint chair at 1:56 p.m.  ECF No. 93-3(5).  Following the examination, Plaintiff was taken in the restraint chair to another cell.  *Id.*  Officers remove the chair restraints and walk Plaintiff into the cell; Plaintiff is told to kneel down so the leg restraints can be removed.  *Id.*  At least 4 orders are given for Plaintiff to kneel down, but he is not compliant.  *Id.*  Plaintiff is then forced to his knees while officers unlock and remove the leg restraints, but the door to the cell does not close.  *Id.*

Officers stand at the cell entrance to block Plaintiff from leaving as one officer moves out of view of the camera, but at the 26½ minute mark, Plaintiff can been seen charging from the back of the cell toward the officers, striking them in the torso area.  *Id.*  The first two officers immediately take Plaintiff to the ground in front of the cell, and the other officers use their arms and legs to apply pressure and restrain Plaintiff so he can be again placed in cuffs.  *Id.*  Plaintiff can be heard yelling, saying he can't breathe, and the cuffs were too tight.  *Id.*  Plaintiff is taken back into the cell, but the events which take place inside the cell cannot be observed from the camera footage.  *Id.*  It does appear, however, that Plaintiff was placed into a clean cell; his former, contaminated cell appears

to be the cell to the right. *Id.* Plaintiff was left in restraints due to his declaration of a psychological emergency. *See* ECF No. 94-3 at 17.

A nurse was brought to the front of Plaintiff's cell and asked if he was injured. ECF No. 93-3(5). Plaintiff yelled that he was going to kill himself and said his hand "was broke." *Id.* The nurse looked inside and said he did not have any injuries that could be seen. Defendant Sketo advised at 2:09 p.m. that Plaintiff's psychological emergency was waiting to be addressed. *Id.*

Plaintiff was provided a mental health emergency evaluation at 9:45 a.m. on September 30, 2021. ECF No. 94-4 at 7. Plaintiff reported that he had "just lost" his cousin and he said he wanted to kill himself because security was beating him up. *Id.* Plaintiff admitted that he "swallowed a razor when they caught [him] cutting [himself] with it." *Id.* The record noted, however, that Plaintiff's arm "had no cuts on it." *Id.*

Plaintiff was also seen in sick call on October 6, 2021, for his complaints of left jaw pain and left hand pain. ECF No. 103 at 31.[11]

---

[11] To the degree Plaintiff made assertions of additional injuries such as burning eyes, broken bones, a disfigured and unaligned jaw in response to Defendants' summary judgment motion, those assertions are not "evidence" because his response was not sworn under penalty of perjury and Plaintiff did not submit an affidavit. ECF No. 103.

Case No. 4:22cv66-MW-MAF

Plaintiff was able to move his hand, reported no numbness or tingling, but said it was "throbbing." *Id.* An abrasion was visible with mild swelling, so x-rays were ordered. *Id.* The X-rays of Plaintiff's left hand and mandible revealed no fracture or dislocation. ECF No. 94-4 at 10. His soft tissue was "unremarkable," sinuses were clear, and no abnormalities were noted. *Id.*; *see also* ECF No. 103 at 32.

## ANALYSIS

Plaintiff's complaint presented only two claims against the Defendants: (1) that they violated his Eighth Amendment rights by using "excessive force" in violation of the "cruel and unusual punishments" Clause, and (2) they were deliberately indifferent to his medical needs. ECF No. 55 at 12. Notably, Plaintiff also made an allegation of retaliation, *id.* at 10, even though he did not assert it as separate claim within the Statement of Claims section of the complaint.[12] *See Id.* at 12. Even if properly asserted as a separate First Amendment claim, it  is insufficient.

---

[12] Complaints filed by pro se prisoners must be held to "less stringent standards" than pleadings drafted by lawyers and "be liberally construed." Miller v. Donald, 541 F.3d 1091, 1100 (11th Cir. 2008). Such liberal construction of pro se pleadings requires the Court to identify plausible claims whether or not they were artfully articulated. *Id.*

A prisoner presents a valid retaliation claim under the First Amendment if he was disciplined or suffered from other harmful actions because he exercised his right of free speech. *See* Malloy v. Peters, 617 F. App'x 948, 950 (11th Cir. 2015); O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011); Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). Put simply, retaliation is a First Amendment claim and requires First Amendment activity. Plaintiff did not allege that he engaged in such activity but, rather, that Defendants' used unnecessary force against him because he previously assaulted Defendants Sketo and Moore. *Id.* Thus, Plaintiff does not allege "retaliation" for prior protected activity but, rather, revenge for his altercation with officers on a prior occasion. Revenge may be actionable as a "use of excessive force" claim, but it is not separately actionable as a First Amendment retaliation claim.

Additionally, a retaliation claim is invalid if the Defendants' actions would have been taken regardless of Plaintiff's prior conduct. For example, "[a]n inmate cannot state a claim of retaliation for a disciplinary charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying that charge after being afforded adequate due process." Malloy, 617 F. App'x at 950 (citing O'Bryant, 637 F.3d at 1215)).

Case No. 4:22cv66-MW-MAF

The reason is there is no causal connection between the disciplinary report and a prisoner's freedom of speech if the disciplinary action would have been taken regardless of whether the prisoner engaged in protected speech.  O'Bryant, 637 F.3d at 1217 (citing Mosley, 532 F.3d at 1278, n.22).  Here, the same principle holds true - Plaintiff's failure to comply with orders to submit to hand restraints led to Defendants' use of force.  This was not retaliation[13] for prior conduct but a direct response to Plaintiff's refusal to obey a lawful command.  Officers would have taken the same course of conduct regardless of Plaintiff's admitted prior assault on two of the Defendants.

Another claim which is implicit from Plaintiff's allegations, though not specifically asserted in the Statement of Claims portion of the complaint form, is that Plaintiff was sexually assaulted by one of the officers during the cell extraction.  Plaintiff did not, and has not, identified any person who allegedly penetrated his boxer shorts.  ECF No. 94-1 at 45.  Instead, he has stated generally that someone involved is guilty of that act.

---

[13] Plaintiff did assert that Defendant Hewett was aware of Plaintiff's complaints and grievances, but Plaintiff did not assert a retaliation claim against that Defendant. Furthermore, Plaintiff voluntarily dismissed his claims against Defendant Hewett.

Case No. 4:22cv66-MW-MAF

Moreover, Plaintiff recanted his claim.  ECF No. 94-3 at 5.  It appears

that Plaintiff submitted a grievance (see ECF No. 93-3 at 15) in which he

made allegations of sexual assault during the cell extraction on September

29, 2021.  ECF No. 94-3 at 67.  His allegations were forwarded to the

Inspector General's Office for review, *id*. at 68, but Plaintiff "refused" to

make a witness statement when the investigating officer sought to interview

him.  *Id.* at 66.  The evidence shows that Plaintiff denied this incident

occurred at least twice.  ECF No. 94-3 at 5; *see also* ECF No. 93-3.

The Inspector General's Report shows that when Plaintiff was

approached to be interviewed about the alleged sexual assault, Plaintiff

said "he had not made any type of PREA [Prison Rape Elimination Act]

allegations against any staff member."  ECF No. 93-3 at 4.  Plaintiff verbally

"denied submitting any allegations against a staff member" to Captain

Eaker.  *Id.*  Other prison officials "were presented and witnessed" Plaintiff's

denial.  *Id.; see also* ECF No. 93-3 at 8-12.  Plaintiff then refused to provide

a statement concerning the incident, and was "offered a victim advocate,"

but declined.  *Id.* at 4.  Plaintiff's recantation prevented any further

investigation of the matter, and effectively terminated an effective review of

the matter by the Inspector General.  The Inspector General's investigation

concluded with a finding that Plaintiff's allegations were "unsubstantiated." *Id.*; *see also* ECF No. 93-3 at 17.

During Plaintiff's deposition, Plaintiff testified that he could not "prove" who sexually assaulted him, but "assumed" it was the officer who wrote a disciplinary report[14] against Plaintiff for doing something "inappropriate" to a correctional officer."  ECF No. 94-1 at 46.  Plaintiff said that was the "only basis" he had to assume who may have assaulted him.  *Id.* at 47.  He further testified that he was "not specifically accusing him."  *Id.*  He forthrightly admitted that he did not know who committed the alleged assault, and noted it could not have been either Defendant Sketo or Moore because they were not inside the cell.  *Id.* at 47-48.  It could not have been Defendant Fitch either as he was the camera operator.

At this stage of the litigation, Plaintiff has not come forward with any evidence to substantiate his allegation of a sexual assault.  More importantly, Plaintiff provided *argument* within his response to Defendants' summary judgment motion, but Plaintiff did not provide any *evidence* to identify any person who assaulted him.  ECF No. 103.  There is no

---

[14] Plaintiff's testimony was less than clear, but Plaintiff appears to claim that the officer who wrote Plaintiff a disciplinary report for headbutting him in the groin may have been the officer who allegedly put his thumb in Plaintiff's butt.  ECF No. 94-1 at 46-47.

indication he pursued the identification of the person who allegedly assaulted him in the discovery process.  Furthermore, Plaintiff essentially abandoned his claim during the Inspector General's investigation.  By doing so, Plaintiff severely hampered the viability of this claim.  For all the foregoing reasons, it is concluded that even if this claim had been specifically asserted by Plaintiff in his complaint, it is insufficient to proceed to trial and survive summary judgment.

## A.    Deliberate Indifference

As for the two claims properly alleged, Plaintiff's deliberate indifference claim has been considered first.  The Eighth Amendment[15] governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  Although the Amendment does not require comfortable prisons, it prohibits inhumane ones.  *Id.*  The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities."

---

[15] "In the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation."  <u>Thomas v. Bryant</u>, 614 F.3d 1288, 1303-04 (11th Cir. 2010).  This case raises both an excessive force claim and a deliberate indifference to medical needs claim.

Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)).  "[B]asic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety."  Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr.l Inst., 452 F.App'x 848, 850-851 (11th Cir. 2011)).  Plaintiff is entitled to medical care and prison officials may not deny him such care.

Plaintiff's allegations within the body of the complaint[16] were that Defendants Sketo and Moore prevented Plaintiff "from receiving any mental health treatment initially before" the September 29th incident.  ECF No. 55 at 11.  Plaintiff also said that all of the Defendants "were present at some point when" he declared a psychological emergency, but none responded to his emergency or file a mental health referral . . . ."  Id.  Although Defendants acknowledge this claim, it was not addressed in their motion for summary judgment.  ECF No. 95.

---

[16] Plaintiff presented a deliberate indifference claim against Defendant Hewett as well, claiming that he "failed to allow the Plaintiff to receive the appropriate medical treatment before being transferred."  ECF No. 55 at 10.  Plaintiff said he needed treatment for injuries to "his left hand and jaw."  Id.  Because Defendant Hewett has been dismissed, this claim need not be addressed.

First, Plaintiff's allegations within the complaint are conclusory and were unsupported by specific facts to show that any Defendant prevented Plaintiff from receiving mental health treatment.  Second, the record evidence reveals that Plaintiff was given a mental health evaluation and "crisis intervention" prior to the September 29th use of force.  ECF No. 94-3 at 17.  Therefore, Plaintiff has not come forward with evidence to support his claim that Defendants prevented him from obtaining mental health treatment and summary judgment should be granted in their favor on this aspect of Plaintiff's deliberate indifference claim.

Third, Plaintiff has not shown that he was not provided medical treatment after the September 29th use of force either.  Plaintiff was evaluated by medical three times that day, but no injuries were observed beyond superficial abrasions.  When Plaintiff complained later of pain to his hand and jaw, he was provided medical care - x-rays were taken which revealed no fracture, dislocation, or other abnormalities.  Because there is no evidence that Defendants were deliberately indifferent to Plaintiff's need for medical care - regardless of the fact that Plaintiff has not shown he had a "serious medical need" - summary judgment should be granted in Defendants' favor on this claim.

## B.    Use of Force

The Eighth Amendment forbids cruel and unusual punishment. Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003).  A claim that a prison official unnecessarily used excessive physical force on a prisoner falls within the Cruel and Unusual Punishments Clause.  The "core judicial inquiry" for this claim uses the standard set forth in Whitley v. Albers, 475 U.S. 312, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986): "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm."  Hudson v. McMillian, 503 U.S. 1, 6, 112 S. Ct. 995, 998, 117 L. Ed. 2d 156 (1992) (quoting Whitley, at 320-21, 106 S. Ct. at 1085); see also Sconiers, 946 F.3d at 1265 and 1267 (noting that the core inquiry is "the nature of the force - specifically, whether it was nontrivial and was applied maliciously and sadistically to cause harm").

Analysis of an excessive force claim considers: "[1] the need for application of force, [2] the relationship between that need and the amount of force used, [3] the threat 'reasonably perceived by the responsible officials,' ... [4] 'any efforts made to temper the severity of a forceful response,'" and "[5] [t]he absence of serious injury."  Hudson, 503 U.S. at

7, 112 S. Ct. at 999 (quoting Whitley, 475 U.S. at 321, 106 S. Ct. at 1085)

(quoted in Miles v. Jackson, 757 F. App'x 828, 829 (11th Cir. 2018)); *see*

*also* Kingsley v. Hendrickson, 576 U.S. 389, 402, 135 S. Ct. 2466, 2476,

192 L. Ed. 2d 416 (2015).  Courts must take into account "the 'legitimate

interests that stem from [the government's] need to manage the facility in

which the individual is detained,'" and defer "to 'policies and practices that

in th[e] judgment' of jail officials 'are needed to preserve internal order and

discipline and to maintain institutional security.'"  Kingsley, 576 U.S. at 397,

135 S. Ct. at 2473 (quoting Bell v. Wolfish, 441 U.S. 520, 540, 547, 99 S.

Ct. 1861, 60 L. Ed. 2d 447 (1979)).

        Demonstrating an excessive use of force "requires a prisoner to

establish two elements—one subjective and one objective: the official must

have both 'acted with a sufficiently culpable state of mind' (the subjective

element), and the conduct must have been 'objectively harmful enough to

establish a constitutional violation.'"  Sconiers, 946 F.3d at 1265 (quoting

Hudson, 503 U.S. at 8).  To meet the subjective element, a prisoner must

show that the excessive force was "sadistically and maliciously applied for

the very purpose of causing harm."  946 F.3d at 1265 (quoting Johnson v.

Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002)); *see also* Thomas v.

Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).  The objective component

"focuses on whether the official's actions were 'harmful enough,' Hudson,

503 U.S. at 8, 112 S. Ct. 995, or 'sufficiently serious,' Wilson v. Seiter, 501

U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991), to violate the

Constitution."  946 F.3d at 1265.  Nevertheless, "[u]nder the objective

component of an Eighth Amendment claim, the force used, not the injury

sustained, is what 'ultimately counts.'"  Id. at 1267 (quoting Wilkins v.

Gaddy, 559 U.S. 34, 38, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010)).

Analysis of excessive force claims must also consider that "not 'every

malevolent touch by a prison guard gives rise to a federal cause of action.'"

Wilkins, 559 U.S. at 37, 130 S. Ct. at 1178 (quoting Hudson, 503 U.S. at 9,

112 S. Ct. 995); see also 946 F.3d at 1265.  Furthermore, "'routine

discomforts' and other de minimis uses of physical force do not trigger the

'Eighth Amendment's prohibition on cruel and unusual punishments.'"

Hudson, 503 U.S. at 9-10, 112 S. Ct. at 1000 (quotation marks omitted)

(quoted in Thompson v. Smith, 805 F. App'x 893, 901 (11th Cir. 2020)).

> The Eighth Amendment's prohibition of 'cruel and unusual'
> punishments necessarily excludes from constitutional
> recognition de minimis uses of physical force, provided that the
> use of force is not of a sort repugnant to the conscience of
> mankind."  Id. at 37-38, 130 S. Ct. 1175.  Instead, the Eighth

Amendment prohibits force that offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary."

Sconiers, 946 F.3d at 1265-66 (quoting Wilkins, 559 U.S. at 37, 130 S. Ct. 1175 (citation and internal quotation marks omitted)).

Defendants' evidence is that Plaintiff had created a security issue by blocking the view into his cell with feces. Plaintiff did not comply with multiple verbal orders to cuff up so he could be removed from the cell. It is well established in the Eleventh Circuit that a prisoner's failure to comply with verbal orders of a correctional officer provides a basis for a use of force. Miles, 757 F. App'x at 830 (finding "there was a need for that force because, as Miles conceded in his deposition, he not only failed to comply with officer Jackson's order to go further into the jail cell, but also evaded Jackson's attempt to get him to comply") (citing Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990) ("The need for the use of force [was] established by the undisputed evidence that [the prisoner] created a disturbance.").

In this case, Plaintiff claimed he was not creating a disturbance, but the video evidence demonstrates Plaintiff was not compliant with verbal

orders.  He does not deny that fact, although he has testified that he was

unable to comprehend what was happening at the time.  Plaintiff was,

nevertheless, able to grasp the fact that officers were going to spray him

with chemical agents and he was calculated in responding by using his

mattress to protect himself from the effects of those agents.  At any rate,

the use of chemical agents was not unconstitutional or excessive because

Plaintiff was non-compliant with the orders of Defendant Sketo.  Plaintiff did

not suffer unusual pain or discomfort as is evident from the video evidence;

there was no screaming or yelling that he could not breathe or was

suffering from "burning," a typical effect of the agents.

Furthermore, the use of a cell extraction team to force Plaintiff into

handcuffs and remove him from his cell did not violate the Eighth

Amendment.  By failing to comply with orders to submit to restraints, it was

permissible for the Defendants to use force on Plaintiff to gain his

compliance.  Sconiers, 946 F.3d at 1264 (11th Cir. 2020) (finding it is

permissible for correctional officers to "use pepper-spray or a takedown to

subdue an inmate as long as a valid penological reason supports the use

of such force") (citing Thomas, 614 F.3d at 1301-11, and Danley v. Allen,

540 F.3d 1298, 1306 (11th Cir. 2008)).  The undisputed evidence shows

Defendants were justified in using force and that the force used was legitimate and necessary.  No evidence was provided by Plaintiff to show that the force was "maliciously and sadistically [applied] for the very purpose of causing harm."  Summary judgment should be granted in Defendants' favor on this claim as well.

## RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, ECF No. 95, be **GRANTED** and judgment entered in their favor on all claims.

**IN CHAMBERS** at Tallahassee, Florida, on October 9, 2024.


 S/    Martin A. Fitzpatrick                  
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other**

parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u>  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.